**Enrique RUBIO; and Yolanda Mendoza, Plaintiffs,**

v.

**MONSANTO COMPANY, Defendant.**

**CASE NO. CV 15-07426 DMG (Ex)**

United States District Court, C.D. California.

Signed March 24, 2016

Christopher Barton Dalbey, Weitz and Luxenberg PC, Los Angeles, CA, Hunter W. Lundy, Kristie M. Hightower, Matthew E. Lundy, Lundy Lundy Soileau and South LLP, Lake Charles, LA, Maja Lukic, Robin L. Greenwald, Weitz and Luxenberg PC, New York, NY, for Plaintiffs.

Steven Robert Platt, Richard A. Clark, Parker Milliken Clark O'Hara and Samuelian APC, Los Angeles, CA, Eric G. Lasker, Joe G. Hollingsworth, Katharine R. Latimer, Hollingsworth LLP, Washington, DC, for Defendant.

## ORDER RE MOTION TO SEVER; MOTION TO TRANSFER; MOTION TO DISMISS; AND MOTION TO STAY CASE [47, 48, 52]

DOLLY M. GEE, UNITED STATES DISTRICT JUDGE

On September 22, 2015, Plaintiffs Enrique Rubio and Yolanda Mendoza filed this action against Defendant Monsanto Company.[1] They filed an amended complaint on October 20, 2015.[2] The amended complaint alleges claims for strict products liability based on design defect, strict products liability based on failure to warn, negligence, breach of express warranty, and breach of implied warranties.

On November 9, 2015, Monsanto filed a motion to sever Rubio and Mendoza's claims and to transfer them to the Western District of Texas and Eastern District of California, respectively.[3] In the alternative, Monsanto filed a motion to dismiss both plaintiffs' claims.[4] Finally, Defendants filed a motion to stay the case pending the Court's decision regarding the motions to sever and dismiss.[5] Plaintiffs oppose all three motions.[6]

Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the hearing calendared for January 8, 2016 was vacated and the matter taken off calendar. [Doc. # 60.]

## I. FACTUAL BACKGROUND

In the 1970s, Monsanto discovered the herbicidal properties of glyphosate and began marketing it in products under the brand name Roundup.[7] The Environmental Protection Agency ("EPA") and the State of California have registered Roundup for distribution, sale, and manufacture in the United States and the State of California.[8] Generally, the registrant, in this case Monsanto, conducts the health and safety testing of pesticide products. The EPA sets protocols governing the tests and laboratory practices required for registration but does not conduct the tests itself.[9]

According to plaintiffs, the EPA originally classified glyphosate as "possibly car-

1. Complaint, Doc. # 1 (Sept. 22, 2015).

2. First Amended Complaint ("FAC"), Doc. # 24 (Oct. 20, 2015).

3. Notice of Motion and Motion to Sever Claims in Plaintiffs' Amended Complaint ("Motion to Sever"), Doc. # 47 (Nov. 9, 2015); see also Reply in Support of Notion of Motion and Motion to Sever Claims in Plaintiffs' Amended Complaint ("Sever Reply"), Doc. # 57 (Dec. 23, 2015).

4. Notice of Motion and Motion to Dismiss Case ("Motion to Dismiss"), Doc. # 48 (Nov. 9, 2015); see also Reply in Support of Notice of Motion and Motion to Dismiss Case ("Dismiss Reply"), Doc. # 58 (Dec. 23, 2015).

5. Notice of Motion and Motion to Stay Case pending Decision on Monsanto Company's Motions to Dismiss, Sever, and Transfer ("Motion to Stay"), Doc. # 52 (Dec. 11, 2015); Reply in Support of Notice of Motion and Motion to Stay Case pending Decision on Monsanto Company's Motions to Dismiss, Sever, and Transfer ("Stay Reply"), Doc. # 59 (Dec. 23, 2015).

6. Memorandum in Opposition to Notice of Motion and Motion to Dismiss Case ("Dismiss Opposition"), Doc. # 53 (Dec. 18, 2015); Memorandum in Opposition to Notice of Motion and Motion to Stay Case pending Decision on Monsanto Company's Motions to Dismiss, Sever, and Transfer ("Stay Opposition"), Doc. # 54 (Dec. 18, 2015); Memorandum in Opposition to Notice of Motion and Motion to Sever Claims in Plaintiffs' Amended Complaint ("Sever Opposition"), Doc. # 56 (Dec. 21, 2015).

7. FAC, ¶ 1.

8. Id., ¶ 24.

9. Id., ¶ 25.

cinogenic to humans" in 1985.[10] After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to "evidence of non-carcinogenicity in humans" in 1991.[11] On two occasions, however, the EPA purportedly found that the laboratories hired by Monsanto to test the toxicity of its Roundup products had committed fraud.[12]

On July 29, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued a formal monograph, reviewing numerous studies and data relating to glyphosate exposure in humans.[13] The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is "probably carcinogenic to humans."[14] The Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other haematopoietic cancers.[15] Plaintiffs allege that despite the fact that glyphosate is toxic to humans, Monsanto has repeatedly represented that glyphosate is safe to humans and the environment.[16]

As of 2013, glyphosate was the world's most widely used herbicide.[17] Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops.[18] Glyphosate has been found in rivers, streams, groundwater, food, the urine of agricultural workers, and even the urine of urban dwellers who are not in direct contact with glyphosate.[19]

Rubio was exposed to Roundup when he worked as an agricultural worker in Oregon from 1986 through 1988; in Fillmore, California from 1988 through 1993; and in El Paso, Texas from 1993 through 1995.[20] During his time in California, Rubio's duties involved spraying fields, weeds, and bugs with Roundup and other pesticides.[21] As an applicator, Rubio drove a tractor, wore a backpack, and also utilized a hand pump to spray Roundup.[22] During application, his protection was limited to a paper face mask.[23] He sprayed two days per week all year.[24]

Rubio also worked as an applicator during his time in El Paso, Texas.[25] He also applied Roundup once or twice per week all year in Texas, but the frequency at which he sprayed Roundup was lower than while he worked in California.[26]

Rubio was diagnosed with multiple myeloma in 1995.[27] He underwent cancer treatment in El Paso, Texas from 1995 to 1997 and was unable to work.[28] Rubio moved

10. *Id.*, ¶ 28.

11. *Id.*

12. *Id.*, ¶¶ 29-34.

13. *Id.*, ¶ 5.

14. *Id.*, ¶ 6.

15. *Id.*

16. *Id.*, ¶¶ 7-8.

17. *Id.*, ¶ 1.

18. *Id.*, ¶ 3.

19. *Id.*, ¶ 3.

20. *Id.*, ¶ 13.

21. *Id.*, ¶ 67.

22. *Id.*

23. *Id.*

24. *Id.*

25. *Id.*, ¶ 68.

26. *Id.*, ¶ 68.

27. *Id.*, ¶ 70.

28. *Id.*

from Texas to Colorado to live with his nephew in 1997.[29]

Mendoza was exposed to Roundup in Atwater, California, where she currently resides, from 2004 through 2015.[30] From the time she purchased her home in 2004 until 2012, Mendoza personally sprayed Roundup approximately once every two weeks from March through November of every year.[31] She used a backpack to apply the Roundup to her property and recalls breathing vapors as she did so.[32] In late 2012 or early 2013, Mendoza hired landscapers to take care of her property; the landscapers also used Roundup in the treatment of her property.[33] Mendoza was diagnosed with Non-Hodgkin's Lymphoma in October 2012.[34]

Both Plaintiffs purportedly first learned that exposure to Roundup can cause cancer sometime after March 25, 2015, when IARC first published its evaluation of glyphosate.[35] Plaintiffs allege that they could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup and glyphosate is injurious to human health within the time period of any applicable statutes of limitations.[36]

## II. DISCUSSION

### A. Monsanto's Motion to Sever

Monsanto argues that Plaintiffs' claims were incorrectly joined, as they allege different types of exposures that took place in different states and in different decades, giving rise to different types of cancer, which were diagnosed and treated in different states.[37] Monsanto argues that Plaintiffs' claims therefore should be severed and transferred to more appropriate forums.[38] Plaintiffs contend that the claims are properly joined under Federal Rule of Civil Procedure 20(a).[39]

### 1. Legal Standard Governing Permissive Joinder

■ Rule 20(a) governs permissive joinder, and identifies two prerequisites for the joinder of defendants: (1) a right to relief must be asserted against the defendants jointly, severally or with respect to or arising out of the same transaction, occurrence or series of transactions or occurrences; and (2) the claims must involve some question of law or fact common to all defendants. Fed.R.Civ.P. 20(a)(2); *see also League to Save Lake Tahoe v. Tahoe Reg. Plan. Agency*, 558 F.2d 914, 917 (9th Cir. 1977). Joinder is to be construed liberally "in order to promote trial convenience and to expedite the final determination of disputes, thereby preventing multiple lawsuits." *League to Save Lake Tahoe*, 558 F.2d at 917.

■ Nonetheless, district courts retain broad discretion in applying Rule 20. *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1296–97 (9th Cir.2000) (whether severance is appropriate under Rule 20 lies within the sound discretion of the trial court); *Desert Empire Bank v. Insurance Co. of North America*, 623 F.2d 1371, 1375 (9th Cir.1980) (even if the requirements of

29. *Id.*

30. *Id.*, ¶ 14.

31. *Id.*, ¶ 71.

32. *Id.*

33. *Id.*

34. *Id.*, ¶ 73.

35. *Id.*, ¶¶ 70, 73.

36. *Id.*, ¶ 75.

37. Motion to Sever at 1.

38. *Id.*

39. Sever Opposition at 3.

Rule 20 are satisfied, courts must examine other relevant factors to determine whether permissive joinder will comport with principles of fundamental fairness).

■ Even if plaintiffs satisfy the requirements of Rule 20, joinder is still inappropriate unless it "comports with the principles of fundamental fairness." *Desert Empire Bank*, 623 F.2d at 1375. A court has "discretion to refuse joinder in the interest of avoiding prejudice and delay." *Acevedo v. Allsup's Convenience Stores, Inc.*, 600 F.3d 516, 521–22 (5th Cir.2010) (concluding that joinder of plaintiffs' FLSA claims was improper because it would not "facilitate judicial economy and ... different witnesses and documentary proof would be required for plaintiffs' claims").

### 2. Whether Plaintiffs' Claims Satisfy the Requirements of Rule 20

Plaintiffs allege that their claims arise out of the same series of transactions or occurrences: Monsanto's nearly four-decade history of selling glyphosate, while denying its carcinogenic properties. They also argue that their claims contain a number of common questions of fact and law. They contend that they both must prove that Roundup is a defective product, Monsanto's "campaign of deception about the dangers of glyphosate," its instructions about the safe use of Roundup products, and the IARC's classification of glyphosate as a probable carcinogen.[40] They argue that the science underlying their claims is the same, and the differences in their diagnoses and medical histories is no greater than that present in every case involving disease with more than one plaintiff.[41]

Monsanto argues that its testing, marketing, and sale of Roundup over four decades cannot constitute a common question of law or fact, without "enabl[ing] every case alleging personal injuries from exposure to a Monsanto-glyphosate-based product to join Mr. Rubio's suit and proceed in this Court."[42] It also contends that "[a]ny common questions of law or fact are so eclipsed by the individualized issues that dominate Plaintiffs' claims, that joinder of Plaintiff's claims is not warranted here."[43] Finally, Monsanto argues that the legal claims at issue differ because Rubio's claims are governed by Texas law, while Mendoza's claims are governed by California law.

■ "The Ninth Circuit has stated that the first prong-addressing whether the plaintiffs' claims arise from the 'same transaction, occurrence, or series of transactions or occurrences'—refers to the 'similarity in the factual background' of the claims. *Padron v. Onewest Bank*, No. 2:14–CV–01340–ODW, 2014 WL 1364901, at *2 (C.D.Cal. Apr. 7, 2014) (quoting *Coughlin v. Rogers*, 130 F.3d 1348, 1350 (9th Cir. 1997)). "Although there might be different occurrences, where the claims involve enough related operative facts, joinder in a single case may be appropriate." *Nguyen v. CTS Elecs. Mfg. Sols. Inc.*, 301 F.R.D. 337, 341 (N.D.Cal.2014) (citing *Mosley v. General Motors Corp.*, 497 F.2d 1330, 1333 (8th Cir.1974)).

Plaintiffs urges the Court to apply the 8th Circuit's logical relationship test, as established in *Mosley v. Gen. Motors Corp.*, 497 F.2d 1330, 1333 (8th Cir.1974). *Mosley* notes that the Supreme Court has constructed the terms "transaction or oc-

**40.** Sever Opposition at 5.

**41.** *Id.* at 10.

**42.** Sever Reply at 2.

**43.** Motion to Sever at 6, (quoting *Boles v. Eli Lilly & Co.*, No. 1:15–cv–00351, 2015 WL 6132478, at *10 (Oct. 19, 2015 S.D.Ind.)).

currence" in the context of Rule 13(a) counterclaims ·as follows: " 'Transaction' is a word of flexible meaning. It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship." The 8th Circuit then concluded that word "transaction" should be construed the same way in Rule 20. "The analogous interpretation of the terms as used in Rule 20 would permit all reasonably related claims for relief by or against different parties to be tried in a single proceeding. Absolute identity of all events is unnecessary." *Id.* at 1333 (citing *United States v. Mississippi*, at 142-43)

The logical relationship test has not yet been explicitly adopted by the 9th Circuit in the context of Rule 20, but the Ninth Circuit has cited to *Mosley*, and a number of district courts in this circuit have cited to or applied the logical relationship test. *See Aikins v. St. Helena Hosp.*, No. C 93–3933 FMS, 1994 WL 796604, at *2 (N.D.Cal. May 16, 1994)("The Court is unaware of any Ninth Circuit authority applying Rule 20(a) in the context of plaintiff-joinder, but the Ninth Circuit's resolution of cases involving the joinder of defendants implicitly embraces *Mosley*'s approach," citing *League to Save Lake Tahoe*, 558 F.2d); *see also League to Save Lake ·Tahoe*, 558 F.2d at 917 (citing to *Mosley*, 497 F.2d at 1330 for the proposition that "permissive joinder is to be construed liberally in order· to promote trial convenience and to· expedite the final determination, of disputes"); *U.S. ex ·rel. Anthony v. Burke Eng'g Co.*, 356 F.Supp.2d 1119, 1120–21 (C.D.Cal.2005)("Plaintiff's contention that Defendants had a company policy of administering false claims would probably be the same transaction under Rule 20. Here, there is a logical relationship between each alleged false claim made by Defendants. Plaintiff contends Defendants used the same computerized system to manage the scheme of submitting false claims to both federal and state entities").

In particular, a number of cases support a broad interpretation of "transaction or occurrence" in the products liability context. *See Allen v. Similasan Corp.*, No. 12–cv–0376, 2013 WL 2120825, at *2 (S.D.Cal. May 14, 2013) (finding without lengthy discussion that the plaintiffs' claims arose out of the same series of transactions or occurrences where they purchased various homeopathic products from the same company based on the company's unsubstantiated advertising); *see also Simmons v. Skechers USA, Inc.*, No. 4:15–CV–340–CEJ, 2015 WL 1604859, at *4 (E.D.Mo. Apr. 9, 2015) ("plaintiffs here have filed suit against defendants for injuries caused by the same product and arising out of the same design, manufacture, and marketing practices—the same transactions"); *Norwood v. Raytheon Co.*, No. EP–04–CA–127, 2007 WL 2408480, at *4–5 (W.D.Tex.2007)(finding that claims arose from the same transaction or occurrence where two plaintiffs worked with same radiation-emitting equipment, despite the fact that plaintiffs worked for different nations' militaries over different periods of time).

▮ Yet, there are limits to what degree of relatedness is necessary to create a "logical relationship" or to constitute the same transaction, occurrence or series of transactions or occurrences. Even in the products liability context, where plaintiffs allege liability against the same defendant for the same product, permissive joinder may be barred where there are too many plaintiffs or too many differences in the way that the product was used or in the nature of the injury. *See, e.g., Dunbar v. Medtronic, Inc.*, ·No. CV 14–01529–RGK AJWx, 2014 WL 3056081, at *3 (C.D.Cal.

June 25, 2014) (no common transaction or occurrence where different surgeons performed the off-label INFUSE procedures at different locations and different times, and the procedures performed on each of the plaintiffs, the methods of implant, and the surgical sites were not the same); *Heather v. Medtronic Inc.*, No. 2:14–CV–01595–SVW–FF, 2014 WL 2736093, at *1 (C.D.Cal. June 9, 2014) ("The fact that the same [medical] device was used in each plaintiff's surgery is not sufficient to find that they were part of the same transaction or occurrence" because "[p]laintiffs claims arise out of separate surgeries, performed by different surgeons, in different states, in which the Infuse device was used in different off-label manners").

The present case involves only two plaintiffs, who were exposed to the same active ingredient and allegedly suffered from similar ailments as a consequence. On the other hand, as discussed below, there are significant factual differences in the circumstances under which Roundup was applied by Plaintiffs; frequency, duration, and amount of exposure; concurrent exposures to other products; timing of exposure, location, and medical histories. The differences in Plaintiffs' claims more resemble those which courts have found to fail to satisfy even the "logical relationship" test.

Ultimately, however, the Court need not decide whether Plaintiffs' claims are factually similar enough to constitute the same transaction or occurrence, because even if their claims did satisfy both prongs of Rule 20, the interests of fairness and efficiency would dictate that the Court exercise its discretion to sever Plaintiffs' claims.

### 3. Fairness and Efficiency

Plaintiffs argue that joining their two claims is efficient because they contain a number of common issues of fact, namely the allegedly dangerous properties of Roundup, as well as Monsanto's knowledge of those properties at the time Roundup was developed, tested, and marketed.

■ These similarities are outweighed by the differences in Plaintiffs' claims, which render trying the two claims together not only inefficient, but potentially prejudicial. Both Plaintiffs will need to establish that the Roundup chemical caused *their* cancer. While this may involve some overlap of experts, proving causation will be a far different task for each. Plaintiffs applied the pesticide under vastly different circumstances, including frequency and duration of exposure. Plaintiffs lived in different parts of the country when using the chemical and therefore were exposed to different, other potential contributors to their health problems. The exposures were also separated by nearly twenty years, encompassing changes to Roundup's formulation, as well as other environmental factors. These differences outweigh any efficiencies in trying the claims together.

■ Further, trying the two claims together may be prejudicial. Plaintiffs appear to view their most important task in this case as being the need to prove that Roundup causes cancer generally. In order to state a claim, however, they must also demonstrate that Roundup caused *their individual* instances of cancer. Consolidating the two claims may give rise to the easy, potentially prejudicial inference that if Roundup caused Rubio's cancer it caused Mendoza's as well, or vice versa. In other words, by trying the two claims together, one plaintiff, despite a weaker case of causation, could benefit merely through association with the stronger plaintiff's case. *Boles*, 2015 WL 6132478, at *11 (early severance of claims "is a far better solution to resolving each Plaintiff's claim

expeditiously" where claims are different and "there are so few advantages to keeping [ ] claims joined").

Finally, as discussed below, a number of other circumstances dictate transfer of Plaintiffs' claims to different districts. In particular, keeping the claims joined and in the Central District would mean that the Court would have no compulsory process power over certain out-of-state fact witnesses, potentially prejudicing one side or the other. Additionally, as discussed below, different states' laws may apply to Plaintiffs' claims. Severance is therefore warranted in order to enable the Court to transfer Plaintiffs' claims to the appropriate districts.

On the other hand, neither Plaintiff's rights will be prejudiced by severance, as each is free to proceed with his or her individual claims. *See Visendi v. Bank of Am., N.A.*, 733 F.3d 863, 870–71 (9th Cir. 2015) (severance would not prejudice plaintiffs because they remained free to pursue their claims individually). For these reasons, fairness and efficiency suggest that the Court exercise its discretion to sever these cases.

### B. Monsanto's Motion to Transfer

### 1. Legal Standard Regarding Transfer Under 28 U.S.C. § 1404(a)

A district court may transfer an action to a different district court under 28 U.S.C. § 1404(a). Section 1404(a) permits a court to transfer an action "[f]or the convenience of parties and witnesses" and "in the interest of justice," so long as the action could have been filed in the transferee district in the first instance. 28 U.S.C. § 1404(a); *see also Sparling v. Hoffman Constr. Co.*, 864 F.2d 635, 639 (9th Cir.1988) (the district court has broad discretion to transfer a case to another district where venue is also proper); *Commodity Futures Trading Comm. v. Savage*, 611 F.2d 270, 279 (9th Cir.1979) ("Weighing of factors for and against transfer involves subtle considerations and is best left to the discretion of the trial judge"). The district court must "adjudicate motions for transfer [of venue] according to an individualized, case-by-case consideration of convenience and fairness." *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498 (9th Cir.2000) (quoting *Stewart Org. v. Ricoh Corp.*, 487 U.S. 22, 29, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988) (internal quotes omitted)).

In deciding a motion to transfer venue, the court typically weighs a number of public and private factors, including (1) plaintiff's choice of forum; (2) the convenience of the parties; (3) the convenience of the witnesses; (4) the location of books and records; (5) which forum's law applies; (6) the interests of justice; and (7) administrative considerations. 15 Charles A. Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure, §§ 3841-55 (2007). In the Ninth Circuit, the following factors may also be relevant in assessing a motion to transfer venue: "(1) the location where the relevant agreements were negotiated and executed, (2) the state that is most familiar with the governing law, (3) the plaintiff's choice of forum, (4) the respective parties' contacts with the forum, (5) the contacts relating to the plaintiff's cause of action in the chosen forum, (6) the differences in the costs of litigation in the two forums, (7) the availability of compulsory process to compel attendance of unwilling non-party witnesses, and (8) the ease of access to sources of proof." *Jones*, 211 F.3d at 498-99

The burden is generally on the moving party to establish that a transfer will allow a case to proceed more conveniently and better serve the interests of

justice. *See, e.g., Commodity Futures Trading Comm.*, 611 F.2d at 279; *STX, Inc. v. Trik Stik, Inc.*, 708 F.Supp. 1551, 1555–56 (N.D.Cal.1988) ("In seeking to transfer a case to a different district, a defendant bears a heavy burden of proof to justify the necessity of the transfer. The plaintiff's choice of forum should not be easily overturned").

## 2. Motion to Transfer Rubio's Claim to the Western District of Texas

### a. This Action Could Have Been Filed in the Western District of Texas

 As noted, § 1404(a) permits the transfer of an action to another district only where the case could originally have been filed in the transferee court. 28 U.S.C. § 1404(a). To effect a transfer, the transferee court must have subject matter jurisdiction and be a proper venue for the action. Additionally, defendants must be subject to personal jurisdiction in the district, and be amenable to service of process there. *See A.J. Industries, Inc. v. U.S. District Court for Central Dist. of Cal.*, 503 F.2d 384, 386–88 (9th Cir.1974). The parties appear to agree that Rubio's case could have been filed in the Western District of Texas. Nonetheless, the Court must consider this issue, because none of the requirements for transfer can be waived by the parties, and the Court cannot transfer the case if § 1404(a) is not satisfied. *See Hoffman v. Blaski*, 363 U.S. 335, 342–44, 80 S.Ct. 1084, 4 L.Ed.2d 1254 (1960).

### i) Subject Matter Jurisdiction

 The Western District of Texas would have subject matter jurisdiction to hear the action under 28 U.S.C. § 1332. "[J]urisdiction founded on [diversity] requires that parties be in complete diversity and the amount in controversy exceed $75,000." *Matheson v. Progressive Special-*

*ty Ins. Co.*, 319 F.3d 1089, 1090 (9th Cir. 2003); *see also* 28 U.S.C. § 1332(a)(1). Federal courts have jurisdiction only where there is complete diversity, i.e., plaintiff's citizenship is diverse from that of each named defendant. 28 U.S.C. §§ 1332(a)(1), (c)(1). The amount in controversy "claimed by the plaintiff controls if the claim is apparently made in good faith." *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288–89, 58 S.Ct. 586, 82 L.Ed. 845 (1938). Rubio alleges, and the parties do not dispute, that the amount in controversy exceeds $75,000. The amount-in-controversy requirement is therefore satisfied.

 "[A] corporation [is] deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business." 28 U.S.C. § 1332(c)(1). The term "principal place of business" means "the place where a corporation's officers direct, control, and coordinate the corporation's activities. It is the place that Courts of Appeals have called the corporation's 'nerve center.' And in practice it should normally be the place where the corporation maintains its headquarters—provided that the headquarters is the actual center of direction, control, and coordination." *Hertz Corp. v. Friend*, 559 U.S. 77, 92–93, 130 S.Ct. 1181, 175 L.Ed.2d 1029 (2010). Monsanto is a Delaware corporation, with its headquarters and principal place of business in Missouri. It is therefore a citizen of Delaware and Missouri. Rubio is a citizen of Colorado. The Western District of Texas therefore has diversity jurisdiction over the case.

### ii) Personal Jurisdiction

 "The general rule is that personal jurisdiction over a defendant is proper if it is permitted by a long-arm statute and if the exercise of that jurisdiction does not violate federal due process." *Pebble*

*Beach Co. v. Caddy*, 453 F.3d 1151, 1154–55 (9th Cir.2006) (citing *Fireman's Fund Ins. Co. v. Nat'l Bank of Coop.*, 103 F.3d 888, 893 (9th Cir.1996)). The Texas "long-arm statute authorizes the exercise of jurisdiction over those who do business in Texas." *Schlobohm v. Schapiro*, 784 S.W.2d 355, 356 (Tex.1990)(Tex. Civ. Prac. & Rem.Code § 17.042). The Texas Supreme Court "has decided that the broad language of the long-arm statute's doing business requirement allows the statute to reach as far as the federal constitution permits." *Id.* at 137.

To satisfy due process, a defendant must have sufficient "minimum contacts" with the forum state that "maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). There are two recognized bases for exercising personal jurisdiction over a nonresident defendant: (1) "general jurisdiction," which arises where defendant's activities in the forum are sufficiently "substantial" or "continuous and systematic" to justify the exercise of jurisdiction over it in all matters; and (2) "specific jurisdiction," which arises when a defendant's specific contacts with the forum give rise to the claim in question. *Helicopteros Nacionales de Colombia S.A. v. Hall*, 466 U.S. 408, 414–16, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *Doe v. Am. Nat'l Red Cross*, 112 F.3d 1048, 1050–51 (9th Cir.1997).

Plaintiffs assert that this Court has personal jurisdiction over Monsanto because Monsanto knows or should have known that its Roundup products are sold throughout the State of California, and, more specifically, caused Roundup to be sold to Plaintiffs and/or Plaintiff's employers in the State of California. However, it can be inferred from the first amended complaint that these allegations are also true of Texas, as Rubio's employer there also consistently purchased the Roundup that Rubio applied.

Before the court in Texas can exercise specific jurisdiction over Monsanto, three things must be true: (1) Monsanto did some act or consummated some transaction in Texas by which it purposefully availed itself of the privilege of conducting activities in the state or which was purposely directed at the state; (2) Rubio's claims arise out of such activity; and (3) the exercise of jurisdiction is reasonable. *See Doe v. Unocal Corp.*, 248 F.3d 915, 923 (9th Cir.2001); *Fireman's Fund Ins. Co.*, 103 F.3d at 894. To demonstrate purposeful availment, Monsanto must have "engage[d] in some form of affirmative conduct allowing or promoting the transaction of business within the forum state." *Gray & Co. v. Firstenberg Mach. Co.*, 913 F.2d 758, 760 (9th Cir.1990) (citing *Shute v. Carnival Cruise Lines*, 897 F.2d 377, 381 (9th Cir.1990), overruled on other grounds, 499 U.S. 585, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991)).

Here, Monsanto sold its Roundup products in the state of Texas, availing itself of the privilege of conducting activities in the state, and Rubio's claims allegedly arise, at least in part, out of the use of those same products. The Court finds that the exercise of jurisdiction is reasonable in this context, and that the Western District of Texas would have had specific personal jurisdiction over Rubio's claims if they had been brought in that district originally.

### iii) Venue

Finally, venue would have been proper in the Western District of Texas had the case been filed there originally. The propriety of venue in a particular district is governed by 28 U.S.C. § 1391. "A civil

action may be brought in ... a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." 28 U.S.C. § 1391(b). Rubio alleges exposure and medical treatment in the Western District of Texas, constituting "a substantial part of the events or omissions giving rise to the claim." *Id.*; *see also Dawson v. Medtronic, Inc.*, No. CV 12–07504 DMG (AGRx), 2013 WL 3322040, at *2 (C.D.Cal. Mar. 8, 2013)("Because Plaintiff is a citizen of South Carolina and her medical treatment likely took place there, this action could initially have been filed in that venue").

Because the case could originally have been filed in the Western District of Texas, the Court assesses whether it is appropriate to transfer it there.

### b. The Relevant Factors Weigh in Favor of Transferring Rubio's Case to the Western District of Texas

As noted, courts consider a variety of factors in determining whether a transfer would serve "the convenience of the parties and witnesses" and "the interest of justice." 28 U.S.C. § 1404(a); *Jones*, 211 F.3d at 498–99. The Court addresses each of the relevant factors in turn.

### i) Plaintiff's Choice of Forum

Despite the broad discretion afforded the district court in determining whether to transfer venue, a plaintiff's choice of venue is generally accorded deference. *See, e.g., Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508, 67 S.Ct. 839, 91 L.Ed. 1055 (1947) ("[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed"); *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 842 (9th Cir.1986) ("The defendant must make a strong showing of inconvenience to warrant upsetting the plaintiff's choice of fo-

rum"). Even so, "a plaintiff's choice of its home forum is given more weight than its choice of a foreign forum." *GTE Wireless, Inc. v. Qualcomm, Inc.*, 71 F.Supp.2d 517, 519 (E.D.Va.1999).

The Central District is not currently Rubio's home forum, nor does Rubio have any current contact with California. The Central District does have some ties to the controversy, because some of Rubio's exposure to Roundup occurred in this district. Nonetheless, the great majority of the operative facts—including his most recent exposure, the exposure most temporally connected to the diagnosis, and the diagnosis itself—occurred in the Western District of Texas, weighing in favor of transfer.

Consequently, the Court concludes that this factor weighs slightly in favor of granting the motion to transfer.

### ii) Convenience of the Parties

Neither the Central District of California nor the Western District of Texas are convenient forums for either party. Rubio is currently a Colorado resident, and Monsanto's principal place of business is in Missouri. Because either district would be equally inconvenient for Rubio, this is not a case in which the "motion to transfer venue would serve to 'merely shift rather than eliminate the inconvenience.'" *DIRECTV, Inc. v. EQ Stuff, Inc.*, 207 F.Supp.2d 1077, 1084 (C.D.Cal.2002) (quoting *Decker Coal Co.*, 805 F.2d at 843).

Because the transfer would not affect the convenience of the parties in terms of proximity to the district presiding over the case, this factor is neutral.

### iii) Convenience of the Witnesses

The convenience of witnesses is often the most important factor in determining whether a § 1404 transfer is appropriate. *See, e.g., Denver & Rio Grande*

*Western Ry. Co. v. Brotherhood of Railroad Trainmen*, 387 U.S. 556, 560, 87 S.Ct. 1746, 18 L.Ed.2d 954 (1967) ("[V]enue. is primarily a matter of convenience of litigants and witnesses"); *A.J. Industries v. U.S. District Court*, 503 F.2d 384, 386–87 (9th Cir.1974) (discussing the importance and history of the convenience of witnesses in evaluating a § 1404 transfer); *Decter v. MOG Sales, LLC*, No. CV 06–1738 MCE GGH, 2006 WL 3703368, *2 (E.D.Cal. Dec. 14, 2006) ("The convenience of the witnesses is said to be the most important factor in considering a transfer motion," citing *Los Angeles Memorial Coliseum Comm'n v. Nat'l Football League*, 89 F.R.D. 497, 501 (C.D.Cal.1981)).

In assessing whether the convenience of the witnesses favors transfer, the Court must consider both the location and number of witnesses each side has and the relative importance of those witnesses. *Fontaine v. Washington Mut. Bank, Inc.*, No. CV08–5659 PSG Ex, 2009 WL 1202886, at *3 (C.D.Cal. Apr. 30, 2009) (citing *Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1335 (9th Cir.1984)). The Court accords more weight to the inconvenience of non-party witnesses, as party witnesses can be compelled to testify regardless of the forum in which the case is litigated. *See, e.g., Applied Elastomerics, Inc. v. Z–Man Fishing Products, Inc.*, No. C 06–2469 CW, 2006 WL 2868971, *4 (N.D.Cal. Oct. 6, 2006) (citing *STX, Inc.*, 708 F.Supp. at 1556 (discounting the inconvenience of witnesses who were employees of one of the parties because they could be compelled to testify)).

Monsanto argues that the most important fact witnesses in Rubio's case will be his diagnosing and treating physicians, who are located in Texas. Indeed, these witnesses are crucial to what will likely be one of the most contested issues in this case: causation. Particularly in product lia-

bility cases, medical causation is a "critical" issue that "will rest upon testimony and other evidence from … "[p]laintiff's treating physicians," making transfer to that jurisdiction appropriate. *In re Consol. Parlodel Litig.*, 22 F.Supp.2d 320, 324 (D.N.J.1998); *see also Estate of Matthews v. Novartis Pharm. Corp.*, 77 F.Supp.3d 1, 5–6 (D.D.C.2014) (where plaintiff alleged exposure in two states, court transferred the action to state of most recent exposure, treatment, and diagnosis).

In contrast, Rubio argues that some fact witnesses reside in the Central District; he intends to call witnesses from his former place of employment in the Central District to testify as to the fact of his employment there and the conditions under which he was exposed to Roundup. This factual issue is unlikely to be as highly contested—Rubio's testimony alone is likely sufficient and may indeed be the best source of evidence to establish these facts. The Central District witnesses are not, therefore, a convincing reason to keep Rubio's case in this forum. Cf. *Shabani v. Volkswagen Grp. of Am. Inc.*, No. C 12–02365 LB, 2012 WL 4675047, at *4 (N.D.Cal. Oct. 2, 2012) ("In determining whether [convenience to the witnesses] weighs in favor of transfer, the court must consider not simply how many witnesses each side has and the location of each, but, rather, the court must consider the importance of the witnesses").

Because Rubio's diagnosing and treating physicians, key fact witnesses, "are outside the geographic reach of this district's subpoena power, [Monsanto] may not have access to these witnesses at trial. If the case is transferred, the [Western District of Texas] will have subpoena power over the witnesses who reside within that district." *Painter's Dist. Council No. 30 Health & Welfare Fund v. Amgen, Inc.*, 2007 WL 4144892, at *6 (C.D.Cal. Nov. 13, 2007) (citing Fed. R. Civ. P. 45(b)(2)). The

Court finds that the convenience of the witnesses will be optimized by transferring the case to the Western District of Texas. Accordingly, this factor weighs heavily in favor of transfer."[44]

Plaintiffs argue that in order to establish cause for transfer based on convenience of the witnesses, Monsanto must submit "admissible evidence," including affidavits or declarations, about the "alleged key non-party witnesses for whom litigation in this forum would be inconvenient," citing to *Cochran v. NYP Holdings, Inc.,* 58 F.Supp.2d 1113, 1119–20 (C.D.Cal.1998), *aff'd,* 210 F.3d 1036 (9th Cir.2000). "*Cochran,* however, is not binding on this Court, the Ninth Circuit opinion affirming *Cochran* did not affirm the court's reasoning on venue and personal jurisdiction, and the Ninth Circuit case cited by *Cochran* does not explicitly require affidavits or declarations for this showing." *Zut v. Harrah's Entm't, Inc.,* No. C13–2372 TEH, 2013 WL 5442282, at *3 (N.D.Cal. Sept. 30, 2013) (citing *Commodity Futures Trading Comm'n,* 611 F.2d at 279).

▮ Rather, the operative standard in this circuit is that "[i]f the [requested] transfer is for the convenience of witnesses, [the] defendant must name the witnesses it wishes to call, the anticipated area of their testimony and its relevance, and the reasons why the present forum would present hardship to them." *Bohara v. Backus Hospital Medical Benefit Plan,* 390 F.Supp.2d 957, 963 (C.D.Cal.2005). The Court finds that Monsanto has met this burden by establishing that the most important non-party fact witnesses are locat-ed in the Western District of Texas, as discussed above. This factor therefore weighs heavily in favor of transfer.

### iv) Location of the Evidence

▮ "If [a] motion [to transfer venue] is based on the location of [evidence], the [defendant] must show with particularity the location, difficulty of transportation, and the importance of such records." *Bohara,* 390 F.Supp.2d at 963; *see also Allstar Marketing Group, LLC v. Your Store Online, LLC,* 666 F.Supp.2d 1109, 1133 (C.D.Cal.2009).

▮ Monsanto contends that discovery regarding Rubio's case will involve medical records concerning his diagnosis, which are located in the Western District of Texas. This argument is not determinative. Monsanto fails to adduce evidence that Rubio's medical records are so voluminous that it would be difficult to transport them to the Central District or, in this day and age, scan them into an electronic database. Electronic transmission can alleviate much of the burden that the transportation of documentary evidence might otherwise impose. For this reason, this factor does not weigh in favor of transfer.

### v) Which Forum's Law Applies

▮ "While the Court need not yet determine the applicable law, [where] there is a strong possibility that [another state's] law will apply.... this factor weighs weakly in favor of transfer." *Dawson,* 2013 WL 3322040, at *2. In this case, the parties vigorously disagree as to which

---

44. Plaintiffs focus much of their opposition on the assumption that Monsanto's physician witnesses would testify as experts, who would be paid for their time. *See Williams v. Bowman,* 157 F.Supp.2d 1103, 1108 (N.D.Cal. 2001)("The convenience of expert witnesses, however, is given little weight"). Monsanto clarifies that it intends to call Rubio's Texas-based physicians not as retained experts, but as key fact witnesses who, alone, possess unique knowledge regarding Rubio's alleged glyphosate-caused cancer, including his medical history, differential diagnoses, possible alternative causes of his cancer, and the medical description of the extent of his purported injuries and damages. (Sever Reply at 5.)

state's law applies. This Court need not decide the issue. Because Rubio's condition was diagnosed in the Western District of Texas, there is at least a possibility that resolution of Rubio's claims will require application of Texas law. This factor therefore weighs weakly in favor of transfer.

### vi) Interests of Justice

■ "The 'interest[s] of justice' include such concerns as ensuring speedy trials, trying related litigation together, and having a judge who is familiar with the applicable law try the case." *Heller Financial, Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1293 (7th Cir.1989). Monsanto does not argue that this case would be resolved more quickly in the Western District of Texas; even if it did, the court would not view that as a strong reason to transfer the case. *See GTE Wireless*, 71 F.Supp.2d at 520 (" Docket conditions, although relevant, are a minor consideration when all other reasonable and logical factors would result in a transfer of venue"). Furthermore, Monsanto has identified no related litigation currently pending in the Western District of Texas.

■ On the other hand, the fact that potential key witnesses—the doctors that diagnosed and initially treated Rubio—are located outside of this district, and this Court may not exercise compulsory process over them, may impede one side's ability to prove its case. This is not in the interest of justice. This factor strongly favors transfer.

### vii) Administrative Considerations

■ Although Monsanto argues that the Central District of California has twice the civil weighted filings per judgeship than the Western District of Texas, administrative considerations such as docket congestion are given little weight in this circuit in assessing the propriety of a § 1404(a) transfer. *See Gates Learjet Corp.*, 743 F.2d at 1335 (forum non conveniens case). Consequently, this factor does not weigh in favor of transfer.

### viii) The Balance of Factors

■ Three of the relevant factors are neutral, while the remainder of the factors weigh in favor of transfer. The convenience of the parties, location of the evidence, and administrative considerations are neutral, whereas Plaintiff's choice of forum and the applicable law weigh slightly in favor of transfer. The convenience of the witnesses and the interests of justice weigh heavily in favor of transfer. Accordingly, the Court concludes that the Western District of Texas is a more convenient forum and GRANTS Monsanto's motion to transfer Rubio's case.

### 3. Motion to Transfer Mendoza's Case to the Eastern District of California

### a. This Action Could Have Been Filed in the Eastern District of California

Monsanto argues that Mendoza's claim should be transferred to the Eastern District of California. As with Rubio's claim, the Court must first determine whether Mendoza's case could originally have been filed in the Eastern District of California.

■ Mendoza alleges that the amount in controversy exceeds $75,000, and that she is a citizen of California. As discussed above Monsanto is a citizen of Delaware and Missouri. The Eastern District therefore has subject matter jurisdiction over her claim. California has personal jurisdiction over Monsanto for the same reasons discussed above. Finally, venue would have been proper in the Eastern District of California had the case been filed there originally. Mendoza has not established

that any part of her claims occurred in this district. Rather, all of her exposure and medical treatment occurred in or near her residence in Atwater, California, which is in the Eastern District of California. Venue is proper in that district. *See* 28 U.S.C. 1391(b).

Because the case could originally have been filed in the Eastern District of California, the Court assesses whether it is appropriate to transfer it there.[45]

### b. The Relevant Factors Weigh in Favor of Transferring Mendoza's Case to the Eastern District of California

#### i) Plaintiff's Choice of Forum

 Unlike Rubio's claim, Mendoza's claim lacks any connection to the Central District. She does not reside in this district, does not allege any current contact with this district, and her claims depend on events that allegedly occurred in the Eastern District. Thus, her selection of this forum is entitled to even less deference than Rubio's. *Lou v. Belzberg*, 834 F.2d 730, 739 (9th Cir.1987)("If the operative facts have not occurred within the forum of original selection and that forum has no particular interest in the parties or the subject matter, the plaintiff's choice is entitled only to minimal consideration"). This factor does not weigh against transfer.

#### ii) The Convenience of the Parties, Witnesses, and Location of Evidence

 Neither the Central District of California nor the Eastern District of California are convenient forums for Monsanto. Mendoza, on the other hand, resides in the Eastern District of California. This factor therefore weighs in favor of transfer.

Further, as in Rubio's claim, key percipient witnesses regarding Mendoza's diagnosis and treatment are in Atwater, California. Mendoza does not identify any witnesses residing in this district. This factor therefore weighs even more strongly in favor of transfer than it does in Rubio's case.

#### iii) Which Forum's Law Applies

 California law applies to Mendoza's claims. Judges in the Central District and Eastern District are equally familiar with these laws. This factor is therefore neutral.

#### iv) The Interests of Justice

 As with Rubio's case, the Court will not have subpoena power to compel testimony of any fact witnesses that would be pertinent to Mendoza's case, because they all reside in the Eastern District of California in Atwater, CA, which is located well over 100 miles away from this court. Justice would not be served if the availability of witnesses for either side, and therefore the strength of either side's case, depended on the willingness of witnesses to travel over 100 miles to testify. This factor therefore weighs in favor of transfer.

---

**45.** Plaintiffs also advance a pendant venue theory, stating that venue in the Central District of California is appropriate because "a substantial part of the events and omissions giving rise" to Rubio's claims occurred here, and Ms. Mendoza's "closely related" claims are entitled to remain here "under the doctrine of pendant venue." (FAC ¶ 12.) Because Mendoza's claims have been severed from Rubio's and because Rubio's claim will not be venued in this district, Mendoza cannot rely on the doctrine of pendant venue. *See Allstar Mktg. Grp., LLC*, 666 F.Supp.2d at 1127 ("On occasion, where venue exists for the principal cause of action, courts have agreed to adjudicate closely related claims even if they lacked an independent source of venue").

### v) Administrative Considerations

Because administrative considerations such as docket congestion are given little weight in this circuit, this factor does not weigh in favor of transfer.

### vi) The Balance of Factors

In sum, while two factors are neutral, the remaining factors weigh heavily in favor of transfer of Mendoza's case to the Eastern District of California. The Court therefore GRANTS Monsanto's motion to transfer Mendoza's case to the Eastern District of California.

## III. CONCLUSION

For the foregoing reasons, the Court GRANTS Monsanto's motions to sever Plaintiffs' case. Plaintiff Enrique Rubio's case is transferred to the United States District Court for the Western District of Texas. Plaintiff Yolanda Mendoza's case is transferred to the United States District Court for the Eastern District of California. Monsanto's motions to dismiss and to stay are DENIED as moot.